**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

KELLY E. RHYNE,                    )
                                   )
            Petitioner,            )        3:06-CV-00082-LRH-VPC
                                   )
vs.                                )
                                   )        **ORDER**
E.K. McDANIEL, et al.,             )
                                   )
            Respondents.           )
                                   )
_____/

I.      Introduction

        Before the court is petitioner Kelly E. Rhyne's Motion for Leave to Conduct Discovery (docket #37). Rhyne seeks the court's permission to conduct certain discovery in support of his effort to obtain habeas relief from a sentence of death imposed by the Fourth Judicial District Court for Nevada. Rhyne filed his Motion for Leave to Conduct Discovery on December 15, 2006. On December 19, 2006, he submitted 23 exhibits in support of the motion, including 10 proposed subpoenas (docket #38). On February 1, 2007, respondents filed an opposition to the discovery motion (docket #41), which they supported with 18 exhibits (docket #42). On February 15, 2007, Rhyne filed a reply to the respondents' opposition to his discovery motion (docket #44).

///

///

///

1  II.     Background

2         In its opinion on Rhyne's direct appeal, the Nevada Supreme Court described the

3  factual background of this case as follows:[1]

4         At around 9:00 p.m. on the night of October 31, 1998, Kelly Rhyne arrived at
   what was then known as the Miner's Camp bar.  James Mendenhall and the victim,
5  Donald "Lobo" Brown, were also at the bar.  An auction was taking place at the bar,
   and people were drinking and bidding.  Photographs taken during the auction and
6  eyewitness testimony confirmed that Rhyne was wearing a red t-shirt, a black vest,
   jeans, a black jacket, and white high-top tennis shoes. Mendenhall was wearing a
7  denim shirt, a cap, and boots.

8         Sometime before 10:00 p.m., a patron at the bar overheard Rhyne say to
   Mendenhall, "I hate that f---ing guy." Mendenhall replied, "Don't do anything in here.
9  We'll wait until he gets outside."  The patron ultimately concluded that Rhyne and
   Mendenhall were referring to the victim, Donny Brown.  After the auction ended,
10 Brown and Rhyne were seen leaving the bar a few minutes apart.  Mendenhall then
   became involved in an altercation near the front door of the bar.  After the altercation,
11 Rhyne returned, asked Mendenhall if he was okay, and then left the bar with
   Mendenhall.  When they returned later, Mendenhall's shirt had blood on it.  He
12 removed it and placed it over a chair.  Rhyne later retrieved the shirt and again left the
   establishment.  Later, via aerial search, police found the shirt on the roof of a building
13 near Rhyne's residence.

14        At around 1:00 a.m., a porter at a nearby hotel observed two men place a body
   in a dumpster.  Police later found the body of Donny Brown in the dumpster,
15 apparently beaten to death.  His head had been crushed, and there was a large
   v-shaped indentation in the side of his head that matched the lug of Mendenhall's
16 boot.  There were also "ladder-like" marks on Brown's face that were suggestive of a
   pattern from the sole of a tennis shoe.

17

18        When police contacted Rhyne at his residence at around 3:00 a.m., he was
   alert and cooperative.  Rhyne maintained that he had arrived at the bar around 9:00
19 p.m. and left only once to get cigarettes at around 12:00 a.m.  Rhyne allowed police to
   search his room and told them he had been wearing a pair of workboots that night.
20 But the boots Rhyne pointed out had no blood on them, and police found nothing
   incriminating in the residence.

21        When the police returned to Rhyne's residence at 8:00 a.m., he voluntarily
   accompanied them to the police station and gave a statement.  He again maintained he
22 had been at the bar all evening and had only left once to purchase cigarettes.  He
   denied spending time with Mendenhall and denied leaving with him at any time. The
23 police arrested Rhyne after the interview.

24

25        [1] The court sets forth this background information, as stated by the Nevada Supreme Court, only
   to provide context for this order.  The court does not intend to make any findings with respect to the facts
26 stated in this section of this order.

2

        During Rhyne's interview, police located Mendenhall, who accompanied the
police to the station and was ultimately arrested.  DNA tests revealed a substantial
amount of Brown's blood on Mendenhall's clothes and boots.  A small amount of
Brown's blood was also found on Rhyne's pants, jacket, and on his ring.  The white
tennis shoes Rhyne had been seen wearing and his red shirt and black vest were never
found.

        The State charged Rhyne and Mendenhall with murder, felony murder,
robbery, and conspiracy to commit murder and filed notices of intent to seek the death
penalty against both men.  On August 8, 1999, the district court granted a motion to
sever the trials, and on August 31, 1999, Mendenhall entered an *Alford* plea to one
count of second-degree murder and one count of conspiracy to commit murder.  The
State agreed not to oppose concurrent sentences, and Mendenhall agreed to provide a
written statement regarding the incident.  He also agreed that he could be called to
testify at Rhyne's trial, but that his testimony was not part of the plea negotiations.
Mendenhall ultimately testified against Rhyne.

        The jury trial began March 15, 2000.  Much of the incriminating evidence
presented at trial has already been noted:  Rhyne's professing hatred toward Brown on
the night of the murder and Mendenhall's ominous response; the suspicious
disappearance of the shoes, shirt, and vest that Rhyne was wearing that night; the
presence of the victim's blood on Rhyne's pants, jacket, and ring; and Rhyne's false
statement to police that he had never spent time with or left the bar with Mendenhall.
In addition, Mendenhall testified and incriminated Rhyne while denying his own
culpability.  According to Mendenhall, after his altercation by the door of the bar,
Rhyne came to the door and called to him to come outside.

        When he followed Rhyne outside and into the alley, he saw a man slumped
over on the ground.  Rhyne asked him for help putting the man in the dumpster.
Mendenhall initially refused, but Rhyne "had a crazy look in his eyes," and he
threatened that if Mendenhall did not help him throw Brown's body into the dumpster,
Mendenhall would end up lying alongside of him.  Mendenhall was afraid and
reluctantly helped Rhyne.  As they carried the body to the dumpster, Mendenhall
slipped and fell.  Mendenhall also testified that in moving the body he got blood on
his hands and clothes.  After moving Brown's body, Mendenhall went back into the
bar.  When Rhyne came back into the bar, he told Mendenhall to keep his mouth shut
and to go home.

        The jury returned a verdict convicting Rhyne of first-degree murder and
conspiracy to commit murder, but acquitting him of robbery.  At the close of the
three-day penalty phase the jury returned a sentence of death.  The jury found the
three aggravating circumstances alleged by the State: torture or mutilation, a prior
conviction for battery by a prisoner, and a prior conviction for attempted assault with
a deadly weapon.  The jury found two mitigating circumstances: the murder was
committed while Rhyne was under an extreme mental or emotional disturbance, and
Rhyne has suffered a serious mental disorder during his life as a result of his long
struggles with bipolar disorder and problems taking his medications.  The jury found
that the mitigating circumstances did not outweigh the aggravating circumstances and
imposed a sentence of death.  On May 1, 2000, the district court entered a written
judgment of conviction and sentence of death pursuant to the jury's verdict. . . .

*Rhyne v. State*, 118 Nev. 1, 5-7, 38 P.3d 163, 166-167 (2002) (internal footnote omitted).  The Nevada Supreme Court affirmed Rhyne's conviction and his death sentence.  *Id*., 118 Nev. at 15, 38 P.3d at 172.

On November 13, 2002, Rhyne filed a petition for writ of habeas corpus in the Fourth Judicial District Court for Nevada, the court in which he was convicted.  On April 20-21, 2004, the state district court held an evidentiary hearing on the petition and then, on July 7, 2004, entered an order denying relief.  Rhyne appealed.

On April 8, 2005, the Nevada Supreme Court remanded the case to allow the state district court to provide specific findings of fact and conclusions of law supporting its denial of relief.  On July 26, 2005, the state supreme court affirmed the lower court's amended order denying relief.  On February 13, 2006, Rhyne filed the petition that initiated this action.

III.    <u>Discovery Sought by Rhyne</u>

Rhyne identifies several theories of habeas relief he seeks to explore by means of discovery.  He asks the court's permission to conduct discovery to assist him in showing: (1) that trial counsel operated under a conflict of interest in representing him, (2) that he is actually innocent in the murder of Brown or, at least, less culpable than Mendenhall, (3) that he was deprived of effective assistance of trial counsel in the guilt phase of his trial because counsel failed to conduct adequate discovery relating to the state's experts and other impeachment evidence, (4) that the State used improper inducements to obtain the cooperation of witnesses, (5) that the State failed to disclose material exculpatory and impeachment evidence, (6) that the State improperly based its exercise of peremptory challenges on the gender of potential jurors, and (7) that the State was arbitrary and capricious in pursuing the death penalty.  The factual allegations in support of each of the foregoing theories are contained in the points and authorities Rhyne filed with his discovery motion.

///

4

1    A. *Standards Governing Discovery in Habeas Corpus Actions*

2          Rule 6 of the Rules Governing Section 2254 Cases in the United States District

3    Courts states:  "A party shall be entitled to invoke the processes of discovery available under the

4    Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion

5    and for good cause shown grants leave to do so, but not otherwise."  The Supreme Court has

6    construed Rule 6, holding that if through "specific allegations before the court," the petitioner can

7    "show reason to believe that the petitioner may, if the facts are fully developed, be able to

8    demonstrate that he is ... entitled to relief, it is the duty of the court to provide the necessary facilities

9    and procedures for an adequate inquiry."  *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting

10   *Harris v. Nelson*, 394 U.S. 286,  300 (1969)).

11         The Ninth Circuit Court of Appeals has pointed out that "[a] habeas petitioner does

12   not enjoy the presumptive entitlement to discovery of a traditional civil litigant."  *Rich v. Calderon*,

13   187 F.3d 1064, 1068 (9th Cir. 1999) (citing *Bracy*, 520 U.S. at 903-05).  "Rather, discovery is

14   available only in the discretion of the court and for good cause shown...."  *Id.*  The court instructed:

15         Habeas is an important safeguard whose goal is to correct real and
     obvious wrongs.  It was never meant to be a fishing expedition for
16       habeas petitioners to "explore their case in search of its existence."

17   *Rich*, 187 F.3d at 1067.  Accordingly, a habeas petitioner will not be granted leave to conduct

18   discovery based on allegations that are purely speculative or without any basis in the record.  On the

19   other hand, a petitioner is not necessarily required to plead specific facts entitling him to habeas

20   relief *prior* to obtaining leave to conduct discovery.

21         Indeed, based on the the Supreme Court's decision in *Bracy*, a petitioner may be able

22   to establish "good cause" for discovery even though he posits only a plausible "theory" for relief.  In

23   *Bracy*, the petitioner sought discovery to support a claim that, because the judge in his case was

24   convicted of taking of bribes from some criminal defendants, he was prone to "a sort of

25   compensatory bias against defendants who did not bribe [him]."  *Bracy*, 520 U.S. at 905.  Although

26

5

the petitioner had not alleged facts sufficient to establish that his particular case was infected by such bias, the Supreme Court found that he was nonetheless entitled to conduct discovery based on evidence that "lend[ed] support" to an actual bias claim. *Id.* at 909. Thus, a petitioner seeking leave to conduct discovery is not required to show that the requested discovery is likely to lead to habeas relief, only that there is "reason to believe" that it "may" do so. *Id.* at 908-09.

B. *Analysis*[2]

1. Conflict of Interest

Rhyne alleges that his trial counsel, Matthew Stermitz and Jeffrey Kump, operated under a conflict of interest because both attorneys represented other individuals whose interests were adverse to Rhyne's. According to Rhyne, Stermitz and Kump represented two inmates, Floyd "Butch" Allen and Christopher Brodhecker, who had contact with Mendenhall at the Northern Nevada Correctional Center and allegedly heard Mendenhall confess to killing Brown. Rhyne further alleges that Stermitz and Kump's representation was compromised by their efforts to avoid scrutiny after Allen told a deputy district attorney, Laura Grant, that Stermitz had offered to pay him (Allen) for his testimony. In addition, Rhyne asserts that Kump represented a man named Robert Stepper, who was purportedly incarcerated in the Elko County Jail at the same time as Rhyne and who claimed to have been privy to a conversation wherein Rhyne confessed to killing Brown.

Having reviewed the pertinent claim in Rhyne's habeas petition (Claim One) and the allegations and supporting material submitted with his discovery motion, this court is without reason to believe that the discovery Rhyne seeks will assist him in demonstrating that he is entitled to relief based on an alleged conflict of interest. A habeas petitioner is entitled to relief under the "conflict of interest" doctrine where he establishes that a conflict of interest adversely affected counsel's

---

[2] In analyzing whether Rhyne has established good cause for his various discovery requests, this court has considered both the allegations and supporting documents submitted with his current motion (docket #37 and 38) and the allegations and supporting documents incorporated in his pending habeas petition (docket #3 through 24).

6

1   performance. *Mickens v. Taylor*, 535 U.S. 162, 172 (2002).  Merely establishing that counsel had a

2   potential conflict of interest is insufficient to provide relief where there is no showing that the

3   conflict had an adverse impact on counsel's representation.  *Id*.  Although Rhyne has provided the

4   court with an elaborate set of factual allegations relating to counsel's involvement with Allen,

5   Brodhecker, and Stepper, he offers only speculation as to how counsel's performance may have been

6   adversely affected by such involvement.

7            As an initial matter, the court gives no credence to the allegation that Stermitz bribed,

8   or attempted to bribe, either Brodhecker or Allen for favorable testimony.  Instead, the evidence

9   provided by Rhyne indicates that Allen fabricated the allegation for his own purposes.  Accordingly,

10  any suggestion or allegation that Stermitz's representation of Rhyne was impacted by such a scheme,

11  or by Stermitz's efforts to cover up such a scheme, is wholly unsubstantiated.  Likewise, the court

12  finds highly speculative Rhyne's theory that, to avoid implicating himself in criminal conduct,

13  Stermitz limited his cross-examination of Grant's rebuttal testimony at trial.

14           Rhyne maintains that Stermitz was serving his own interests or the interests of his

15  former or current clients in deciding whether or not to call Brodhecker and Allen as witnesses.  The

16  record indicates, however, that counsel had legitimate reasons, consistent with Rhyne's interests, that

17  counseled against having either Brodhecker or Allen testify for the defense.  In fact, Claim Nine of

18  Rhyne's petition is premised on the alleged prejudice Rhyne suffered when the trial court, against

19  counsel's wishes, forced counsel to call Brodhecker as a witness.  Likewise, the record shows that

20  counsel chose to not use Allen as a witness because he was uncooperative and because he appeared

21  to be manipulating the situation for personal gain, not because counsel were burdened by a conflict.

22  See exhibit 6.11, 7.11, and10.[3]

23

24

25

26      [3] Unless otherwise noted, the exhibits cited herein were submitted with Rhyne's habeas petition
     and are located at docket #4 through 24.

7

1          Rhyne also contends that, due to a conflict of interest, counsel were unable to fully

2   explain to him the danger of having Brodhecker testify.  As result, according to Rhyne, he insisted

3   on having Brodhecker testify even though it was against his own best interests.  Absent from

4   Rhyne's allegations, however, is the pivotal information counsel allegedly withheld that would have

5   dissuaded him from insisting that Brodhecker testify.

6          Finally, with regard to Kump's involvement with Stepper, Kump's representation of

7   Stepper had concluded when he undertook his representation of Rhyne.  Furthermore, Stepper was

8   never called as a witness against Rhyne.  The court is unable to discern, nor does Rhyne explain,

9   how Kump's advocacy on behalf of Rhyne may have suffered as a result of Kump's prior

10  involvement with Stepper.

11         In short, the court recognizes that Kump and Stermitz's representation of putative or

12  actual witnesses created the potential for a conflict of interest, however Rhyne has not provided

13  reason to believe that an *actual* conflict of interest adversely affected counsel's performance in his

14  case.  Therefore, Rhyne has not shown good cause for discovery in relation to his conflict of interest

15  claims.

16               2.  Forensic Evidence Examined or Developed by State's Experts

17         For the stated purpose of developing his claim of actual innocence, Rhyne seeks

18  permission to request comprehensive discovery of records and materials relating to all the forensic

19  examinations conducted by the State in connection with the prosecution of this case.  Docket # 37, p.

20  15-20; docket #38, exhibit 14 and 15.  Part of the theory underlying Rhyne's actual innocence claim

21  is that the available forensic evidence does not support Mendenhall's testimony that his role in the

22  murder was limited to helping Rhyne throw Brown's body in the dumpster.  Rhyne also contends

23  that forensic evidence implicates Mendenhall as the more culpable, if not the primary, assailant.  In

24  advancing this theory, Rhyne notes ambiguities and inconsistencies in the testimony of the State's

25  medical examiner, Dr. Amy Llewellyn, with respect to the source of Brown's various injuries and the

26

1   cause of his death.  He also points to discrepancies between the State's theory of the crime and

2   Llewellyn's findings, especially as to what caused various marks or imprints found on Brown's head

3   and neck (i.e., which ones could be attributed to Mendenhall's boots, Rhyne's tennis shoes, or some

4   other object) and as to which injury was most likely to have resulted in Brown's death.

5          Rhyne also focuses heavily on blood-stain evidence from Mendenhall's clothes and

6   boots that, according to Rhyne, discredits Mendenhall's version of the events surrounding the

7   murder.  As noted in the Nevada Supreme Court's statement of facts set forth above, a substantial

8   amount of Brown's blood was found on Mendenhall's clothes and boots.  While Mendenhall

9   testified at trial that he got blood on his hands and clothes in the process of moving the Brown's

10  body into the dumpster, Rhyne contends that a review of the available evidence by forensic experts

11  retained by the defense resulted in findings that conflict with details contained in Mendenhall's trial

12  testimony, plea bargain statement, and statements to the police.  For example, Rhyne asserts that

13  forensic evidence does not support Mendenhall's statement that he fell while moving Brown's body

14  or that he and Rhyne dropped Brown's body as they tried to swing it into the dumpster.

15         While the threshold showing required for federal habeas relief based on a

16  *freestanding* claim of actual innocence is "extraordinarily high" (*Herrera v. Collins*, 506 U.S. 390,

17  417 (1993)), Rhyne alleges constitutional violations in conjunction with his claim of actual

18  innocence.  He claims that ineffective assistance of trial counsel, prosecutorial misconduct, and the

19  State's failure to comply with its disclosure obligations under *Brady v. Maryland*[4] resulted in the jury

20  finding that he, not Mendenhall, was primarily responsible for Brown's death.  More specifically, he

21  alleges that trial counsel were ineffective by failing to discredit Llewellyn's testimony and by not

22  presenting testimony from a blood splatter expert to refute the State's case.  He also claims that the

23  prosecution improperly manipulated the findings and testimony of its forensic experts to comport

24

25

26      [4] 373 U.S. 83 (1968).

9

1   with its theory of the case.  In addition, he contends that the prosecution withheld potentially

2   exculpatory forensic information that should have been disclosed under *Brady*.

3          Rhyne has not presented a coherent theory as to how Brown was killed, nor has he

4   proffered evidence that could be considered a persuasive demonstration of his innocence.   He has

5   raised, however, substantial concerns about the reliability of the outcome of his trial.  Without the

6   benefit of having the full state court record before it, this court is unable to determine whether the

7   evidence the State presented at trial was as insubstantial and fraught with inconsistencies as Rhyne

8   claims.  However, at least two justices on the Nevada Supreme Court were convinced, based in part

9   on the forensic evidence, that Mendenhall's testimony was incredible and that he was at least

10  "equally culpable" for the murder.  *Rhyne*, 118 Nev. at 18, 38 P.3d at 174 (Becker J.and Rose J.,

11  concurring in part and dissenting in part).  Moreover, the respondents, in opposing his motion for

12  discovery, have not refuted Rhyne's claims that the forensic evidence discredits Mendenhall's

13  testimony and implicates Mendenhall as the primary assailant.

14         As such, the court finds that Rhyne has established good cause for discovery under

15  the *Bracy* standard in relation to materials relating to the forensic examinations and tests conducted

16  by the State.  However, for reasons set forth in section IV., below, Rhyne shall not be permitted to

17  conduct the discovery he requests at this point in the proceedings.

18              3. Parole and Probation Records for Rhyne, Mendenhall, Stepper,
                                   Brodhecker, and Allen.

19

20         Rhyne asks for permission to subpoena from the Nevada Division of Parole and

21  Probation the complete files and other information relating to himself, Mendenhall, Brodhecker,

22  Stepper, and Allen.  His stated reason for seeking the production to this material is "to determine the

23  extent to which these witnesses received benefits from their cooperation with the State in either the

24  investigation of Mr. Stermitz or in the State's case against Mr. Rhyne."  Docket #38, p. 20.

25  According to Rhyne, the Division's files for the specified individuals will assist him in

26

                                              10

1   demonstrating that the prosecution violated its duty of disclosure under both state law and the

2   Constitution and that his trial counsel was ineffective in not conducting a more adequate

3   investigation.

4          Absent from Rhyne's arguments is a concrete reason to believe that the requested

5   material contains information that the State had a duty to disclose to the defense, but failed to.  As

6   respondents point out, the benefits that Mendenhall received in exchange for his testimony against

7   Rhyne are readily apparent in the court record.  As for other possible exculpatory or impeachment

8   evidence relating to Mendenhall, Rhyne contends only that it is "unclear" whether the prosecution

9   disclosed all of Mendenhall's prior convictions.

10          As for the files relating Brodhecker, Allen, Stepper, and himself, Rhyne provides no

11  hint as to what might be found therein that the prosecution should have provided to defense counsel

12  under its duty to disclose or that defense counsel should have unearthed in order to provide effective

13  representation.  Therefore, Rhyne has not shown good cause for the discovery of parole and

14  probation records for Mendenhall, Stepper, Brodhecker, Allen, or himself.

15                  4.  Rhyne's Shoes

16          With his discovery motion and in Claim VI of his habeas petition, Rhyne advances a

17  theory of relief premised on allegations that the prosecution withheld evidence and intentionally

18  misrepresented evidence relating to the shoes he was wearing the night of the murder.  Rhyne's shoes

19  were potentially a critical point because, as noted above, photographs confirmed that Rhyne was

20  wearing tennis shoes at the party in the bar prior to the murder and "the 'ladder-like' marks on

21  Brown's face . . . were suggestive of a pattern from the sole of a tennis shoe."  *Rhyne*, 118 Nev. at 6,

22  38 P.3d at 166.  The shoes Rhyne was seen wearing were never found.  *Id*.

23          Among the allegations Rhyne makes in support of his theory of prosecutorial

24  misconduct and *Brady* violations are the following.  A witness, Randy Silicato, reported to police

25  shortly after the murder that Rhyne was wearing Nike tennis shoes on the night Brown was killed.

26

1   The prosecution reported to defense counsel that it had found a particular type of tennis shoe, a

2   Converse brand shoe, that had a tread pattern consistent with marks found on Brown's face.  The

3   prosecution's purported discovery of a matching shoe dissuaded Rhyne's counsel from presenting

4   testimony from their own expert that a Nike tennis shoe - i.e., the brand that Rhyne was reported to

5   have been wearing on the night of the murder – was not the source of the marks.  The prosecution

6   failed to disclose any testing or analysis to the defense to support its claim of having found a

7   matching shoe.  The prosecution failed to disclose any police reports of Silicato's statement.  An

8   investigator from the State had contacted Nike and was informed that the tread pattern found on

9   Brown was not consistent with any Nike shoe in production at the time of the murder.  Nonetheless,

10  the prosecution argued at trial that marks found on Brown's face were consistent with Rhyne's shoes.

11          Rhyne uses the foregoing allegations in support of a request to subpoena records from

12  the Elko County District Attorney, the Washoe County Sheriff's Office (Forensic Science Division)

13  and the Washoe County Coroner's Office.  A review of Rhyne's various allegations and the

14  documents he cites to support them discloses numerous shortcomings with his theory for relief.

15  First, Rhyne appears to have taken some liberties with respect to making allegations that are either

16  not substantiated or only tenuously substantiated by the documents to which he cites as support for

17  his claims.  For example, Rhyne cites to a declaration from Jeffrey Kump (exhibit 6.11) and Kump's

18  post-trial memorandum (exhibit 10) as support for his allegation that, *prior to trial*, the prosecution

19  told defense counsel that the State had located a *Converse* shoe with tread pattern similar to the

20  marks found on Brown's face.  Neither document, however, makes a single reference to that

21  particular brand of shoe, and, according to Kump's post-trial memorandum, the discussion at issue

22  took place on April 13, 2000, which would have been *after* the guilt phase of Rhyne's trial, albeit

23  prior to the penalty phase.

24          As another example, the declaration from the Nike representative, Herbert Hedges,

25  does not show, as Rhyne suggests, that the State had been informed that the marks on Brown's face

26

12

1   were not caused by a Nike shoe.  Exhibit 6.14.  Instead, the declaration shows only that Hedges had

2   advised the State investigator that, based on photographs he reviewed, he was unable to make an

3   affirmative identification with respect to either the shoes the "suspect" (presumably Rhyne) was

4   wearing *or* the source of the marks on the "victim's face."  Id.

5           As for Silicato's statements about Rhyne's shoes, Rhyne notes that Silicato testified at

6   the preliminary hearing that he had told the police that Rhyne was wearing Nike shoes.  This fact

7   alone does not establish, however, that the State failed to disclose police reports to the defense.

8   Moreover, Silicato's testimony at the preliminary hearing (which was held approximately six weeks

9   after the murder and more than a year prior to Rhyne's trial) gave the defense ample notice of

10  Silicato's statements regarding Rhyne's shoes.  In fact, it appears as if counsel, relying at least in part

11  on Silicato's statement, attempted to develop a defense based on the theory that Rhyne was wearing

12  Nike shoes and that the pattern on Brown's face did not match a Nike tread.  Exhibits 6.11, 10, 18,

13  and 19.

14          In summary, the exhibits Rhyne has submitted with his motion and his petition do not

15  support his claims about the State's alleged manipulation of the shoe evidence.  For one, this court is

16  left with the impression, after reviewing the exhibits, that the available evidence was, and still is,

17  inconclusive as to what particular brand of tennis shoe Rhyne was wearing on the night of the

18  murder.  The photographs to which Rhyne cites to establish that he was wearing "Nike high-top

19  tennis shoes" show a man (presumably Rhyne) wearing white high-top tennis shoes; however, the

20  photographs are not clear enough, at least to the untrained eye, to show that the shoes are the Nike

21  brand.  See docket #3, p. 23 and attached Exhibit 21 at IA-V.  As noted above, the declaration from

22  the Nike expert, Herbert Hedges, indicates that he was unable draw any conclusions from the

23

24

25

26

1    photographs he had been provided.  The reliability of any statement or testimony Silicato may have

2    provided on the subject is difficult to assess based on the record currently before the court.[5]

3               His allegations to the contrary, Rhyne has not shown that the prosecution ever argued

4    or asserted at trial that Rhyne was wearing *Nike* tennis shoes on the night of the murder, nor has he

5    shown that the prosecution withheld any evidence that might indicate that Rhyne's shoes were not

6    the source of the marks on Brown's face.  In addition, the exhibits Rhyne has provided are

7    ambiguous as to the specific reasons the defense opted to not present expert testimony regarding

8    Rhyne's shoes.  In a memorandum defense counsel Stermitz sent to Rhyne's current counsel,

9    Stermitz wrote:

10           . . . The guy from Nike was consulted and called off because he could not help. . . I
             believe he would not rule out a tennis shoe as the cause of the ladder like tool marks
11           on Lobo's face.  Since Kelly was wearing tennis shoes, who would the jury conclude
             put the ladder-like mark on Lobo's face? . . . I did not bring [our forensic experts] on
12           at trial because *our* experts found a shoe which matched the ladder-like tool marks on
             Lobo's face, and the fact that at the conclusion of the State's case it appeared from the
13           admitted evidence that all the medium velocity blood spatter was on Mendenhall and
             not on Kelly.  That allowed me to argue Mendenhall stomped Lobo not Kelly.
14           Offering our experts would only open the door to cross examination concerning the
             shoe *our* expert found, and more blood spatter on Kelly. . . .
15

16   Exhibit 18 (emphasis added).  On the other hand, Kump's declaration and post-trial memorandum

17   suggest that it was the *State's* purported discovery of a matching shoe that influenced their decision

18   to not put on expert shoe evidence.  Exhibit 6.11 and 10.  Even if Kump's recollection is more

19   accurate,  Rhyne has not provided sufficient reason to believe that the prosecution withheld or

20   misrepresented information regarding what the State's experts had found.

21             Accordingly, Rhyne has not shown good cause for discovery to support a claim that

22   the prosecution withheld evidence or intentionally misrepresented evidence relating to the shoes he

23   was wearing the night of the murder.

24   _____

25         [5] For example, Rhyne cites to the preliminary hearing transcript to support his allegation that
     Silicato identified Rhyne's shoes as a Nike product, however, Rhyne has not provided the court with a
26   copy of the cited portion of the transcript.

                                                      14

1        5.  Claim Under *J.E.B. v. Alabama ex rel. T. B.*

2        Rhyne seeks to conduct discovery that he claims will assist him in showing that the

3  State improperly based its exercise of peremptory challenges on the gender of potential jurors, in

4  violation of *J.E.B. v. Alabama ex rel. T. B.*, 511 U.S. 127 (1994).  In support of his request, he points

5  out that the State used six of its peremptory challenges to strike women, while using only three to

6  strike men.  He further asserts that, in examining potential jurors, the State questioned females more

7  extensively than males about their view on the death penalty and whether they could vote in favor of

8  death, if necessary.  Rhyne cites to several specific examples to support his claim that gender bias

9  infected the jury selection process.

10        Rhyne has satisfied this court that his claim under *J.E.B* warrants further factual

11  development through discovery.  However, for reasons set forth in section IV., below, Rhyne shall

12  not be permitted to conduct the discovery he requests at this point in the proceedings.

13        6.  Arbitrary and Capricious Pursuit of the Death Penalty

14        Another theory of relief for which Rhyne seeks discovery relates to the State's

15  decision to seek the death penalty against him.  Rhyne contends that the Elko County District

16  Attorney was arbitrary and capricious in choosing to pursue the death penalty against him, which

17  constituted a violation of his rights under the Eighth Amendment.  In support of this theory, he points

18  to the more lenient treatment accorded Mendenhall.  He also recites the facts of several other murder

19  cases in the late 1990s in which the Elko County District Attorney did not pursue the death penalty

20  for any of the perpetrators.  According to Rhyne, those murders were equally or more egregious than

21  the murder in his case.

22        Based on the foregoing, Rhyne asks permission to subpoena documents in possession

23  of the Elko County District Attorney's office regarding the decision to seek the death penalty in his

24

25

26

1    case and the decision not to in Mendenhall's case and in three other murder cases.[6]   The problem

2    with Rhyne's request is that he has not provided sufficient reason to believe that further factual

3    development of his theory may result in habeas relief.

4              Guided by the Eighth Amendment, the Supreme Court has put several substantive and

5    procedural restrictions in place to ensure that only a narrow class of individuals are eligible for the

6    death penalty and that capital sentencing is individualized rather than automatic, mechanical, or

7    arbitrary.  For the most part, these restrictions affect state legislatures and sentencing authorities (i.e.,

8    judges and juries).  *See*, *e.g.*, *Godfrey v. Georgia*, 446 U.S. 420 (1980) (regarding aggravating

9    circumstances that may be considered); *Lockett v. Ohio*, 438 U.S. 586 (1978) (regarding mitigating

10   evidence that may be considered); *Coker v. Georgia*, 433 U.S. 584 (1977) (death sentence not

11   available for certain crimes); *Gardner v. Florida*, 430 U.S. 349 (1977) (certain procedural

12   restrictions applicable to criminal trials extended into sentencing proceedings);  *Woodson v. North*

13   *Carolina*, 428 U.S. 280 (1976) (prohibiting mandatory death sentence for first degree murder);

14   *Gregg v. Georgia*, 428 U.S. 153, 188-189 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)

15   (discussing *Furman v. Georgia*, 408 U.S. 238 (1972)).  By contrast, no Supreme Court case has held

16   unconstitutional the process, or lack thereof, by which a prosecutor has opted to seek the death

17   penalty against a defendant.  Provided that he or she proceeds within the guidelines imposed by state

18   law, a prosecutor is bestowed with far-ranging discretion in deciding whether to seek the death

19   penalty in a given case.  *McCleskey v. Kemp*, 481 US 279, 296 (1987).  Thus, unless the criminal

20   defendant presents a *prima facie* case of unconstitutional conduct (such as discrimination based on

21   race), a prosecutor is not required to justify his decision to seek the death penalty in a particular case.

22   *Id.*, FN 18.

23   _____

24        [6]  The murder cases Rhyne identifies in his motion are the cases of Fabian Rosas and Michael
     Freed, Jerry White and Michael Woomer, and Mark Hanson.  The court notes, however, that Rhyne's
25   proposed subpoena directed to the Elko County District Attorney's Office does not call for the
     production of documents relating to these particular cases. See exhibit 12 in support of Rhyne's motion
26   for leave to conduct discovery (docket #38).

1    Merely alleging that the prosecutor was "arbitrary and capricious" is not sufficient to

2  establish a *prima facie* case of unconstitutional conduct.  And, the district attorney's decision to not

3  pursue the death penalty against Mendenhall and in the other three cases does not call into question

4  the constitutionality of his decision in Rhyne's case.  The district attorney abandoned his pursuit of

5  the death penalty against Mendenhall as a result of a plea bargain.  As Justice White noted in his

6  dissent in *Roberts,* plea bargaining with a co-defendant in a capital case "is a grisly trade, but it is not

7  irrational; for it is aimed at insuring the successful conclusion of a first-degree murder case against

8  one or more other defendants.  Whatever else the practice may be, it is neither inexplicable, freakish,

9  nor violative of the Eighth Amendment."  *Roberts v. Louisiana*, 428 U.S. 325, 349 (1976) (Justice

10  White dissenting).

11    As for the three other cases, Rhyne has not established how the district attorney's

12  decision in any of those cases was related to the district attorney's decision in his case.  In those three

13  cases, the district attorney may have opted to forego the death penalty for any number of reasons that

14  would have had no bearing on the propriety of pursuing the death penalty against Rhyne.  Based on

15  isolated quotes from a couple of newspaper articles, Rhyne makes a very tenuously supported

16  allegation that budgetary concerns may have played a role in the decision to not pursue the death

17  penalty in the other cases.  Be that as it may, Rhyne has not articulated how that might make *his*

18  sentence unconstitutional.

19    Accordingly, Rhyne has not established good cause for permission to subpoena

20  records from the Elko County District Attorney's office regarding the decision to seek the death

21  penalty in his case and the decision not to in Mendenhall's case and in three other murder cases.

22  IV.  State Court Exhaustion

23    Respondents oppose granting Rhyne permission to conduct the discovery discussed

24  above on the ground that Rhyne has not exhausted his state court remedies in relation to the

25  underlying habeas claims.  Rhyne counters that, in deciding whether to allow discovery, the court is

26

17

governed solely by the good cause requirement set forth in Rule 6 and should not consider whether the claim for which a petitioner seeks discovery may face procedural impediments.

The discovery for which Rhyne has established good cause under Rule 6, independent of any procedural concerns, relates to Claims III, VI, VIII, and X of his habeas petition. Rhyne concedes in his habeas petition that Claim VI and Claim VIII are unexhausted. Docket #3 at p. 3. Based on a review of the arguments Rhyne raised in the Nevada Supreme Court, the remaining claims appear to be unexhausted as well. Docket #42, exhibits A and J.

The issue of allowing discovery in support of unexhausted habeas claims was addressed in considerable depth by this court in *Sherman v. McDaniel*, 333 F.Supp.2d 960 (D. Nev 2004). Based on a review of Ninth Circuit precedent, this court arrived at the conclusion that lack of exhaustion, while perhaps not an absolute bar to discovery, is a factor the district court should consider in exercising its discretion as to whether to allow discovery. *Id*. at 969. Here, it is not disputed that the claims for which Rhyne seeks discovery are unexhausted or that Rhyne neglected to pursue the requested discovery in his state court post-conviction proceeding. In addition, the court finds unconvincing Rhyne's argument that granting leave for discovery is necessary in order to determine whether lack of exhaustion even bars his habeas claims in the first place.

Under the circumstances, Rhyne shall not be permitted to conduct discovery until he establishes that the claims upon which the discovery is based have been exhausted. The fact that he seeks to present claims that are potentially meritorious, but currently-unexhausted, together with the fact that there is no indication that he has engaged in intentionally dilatory litigation tactics create a strong possibility that he will be returning to state court for additional post-conviction litigation. *See Rhines v. Weber*, 544 U.S. 269 (2000). If that turns out to be the case, Rhyne must exhaust not only his substantive habeas claims, but also available avenues for discovery in state court. *See Calderon v. United States District Court* (*Nicolaus*), 98 F.3d 1102, 1106-07 (9th Cir. 1996)

1    Finally, Rhyne's contention that discovery is necessary to ensure that he produces a

2  "a complete *McCleskey* petition" misconstrues the purpose of a federal habeas discovery.  *McCleskey*

3  *v. Zant*, 499 U.S. 467 (1991) stands for the proposition that a habeas petitioner must raise all

4  available claims in his first federal petition or risk having those claims barred as an abuse of the writ.

5  *Id.* at 490.  As discussed above, the purpose of federal habeas discovery is to develop facts in support

6  of a pre-existing theory for habeas relief.  Discovery is not to be used as a tool to ferret out

7  previously-undiscovered claims.  Accordingly, the requirement imposed by *McCleskey* does not

8  provide, in and of itself, a basis for permitting Rhyne to conduct discovery at this point in the

9  proceedings.

10    Based on the foregoing, Rhyne's motion for leave to conduct discovery shall be

11  denied.  In so ruling, however, the court notes that the discovery discussed above for which the court

12  found good cause may be permitted at a future point in these proceedings upon a showing that the

13  claims justifying the discovery have been exhausted and that the discovery was sought, but

14  unavailable, in state court proceedings.

15    **IT IS THEREFORE ORDERED** that petitioner's Motion for Leave to Conduct

16  Discovery (docket #37) is DENIED.

17    **IT IS FURTHER ORDERED** that the schedule for further proceedings set forth in

18  the court's Second Scheduling Order (docket #33) shall remain in effect.

19    DATED this 10th day of May, 2007.

20

21

22

23    _____
     LARRY R. HICKS
24    UNITED STATES DISTRICT JUDGE

25

26

                                    19